UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

# 24-80154-CR-ROSENBERG/REINHART

Case No. _____

18 U.S.C. § 1031
18 U.S.C. § 2

FILED BY __mp__ D.C.

Dec 3, 2024

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - Miami

**UNITED STATES OF AMERICA**

**vs.**

**DAFUD IZA,**

      **Defendant.**

_____/

## INFORMATION

The United States Attorney charges that:

### GENERAL ALLEGATIONS

At all times material to this Information:

### The Patient Protection and Affordable Care Act ("ACA") and ACA Plans

1. In 2010, Congress enacted the ACA in part to expand Americans' access to affordable health insurance. The ACA sought to accomplish this, in part, through federal subsidies that reduced the cost of health insurance for eligible consumers.

2. The ACA established a premium tax credit, also known as a "subsidy," which was a refundable tax credit designed to assist eligible individuals and families in affording health insurance purchased through an "Exchange." An Exchange was an entity that made Qualified Health Plans ("QHPs") available to qualified individuals. QHPs offered over an Exchange are referred to herein as "ACA Plans." In Florida, the Exchange used the HealthCare.gov platform, which was operated by the Centers for Medicare and Medicaid Services ("CMS"). Private insurers offered ACA Plans through the Exchange.

3. To be eligible for a subsidized ACA Plan in Florida, an individual's household income generally was required to be greater than 100% and less than 400% of the federal poverty line.[1] Individuals with projected incomes below the federal poverty line did not qualify for a federal subsidy.

4. The amount of the subsidy available to an eligible consumer was based on a sliding scale; consumers with lower qualifying incomes received a larger subsidy, while consumers with higher qualifying incomes received a smaller subsidy.

5. Consumers who were eligible for a subsidy could elect to receive it in advance, or they could claim it as a lump sum tax credit when they filed a tax return. If a consumer elected advanced payments of the subsidy, this was known as an advance premium tax credit ("APTC").

6. CMS and the Internal Revenue Service ("IRS") established a Memorandum of Understanding governing the process through which CMS authorized the payment of subsidies, including APTCs. Once authorized, the APTC was transmitted directly to the insurer offering the ACA Plan in the form of a payment toward the applicable monthly premium. These federal subsidies were funded through an indefinite refund appropriation administered by the IRS.

7. Consumers who elected to receive subsidy payments in advance in the form of an APTC were required to reconcile the amount advanced with the actual subsidy for which the consumer was determined to be eligible when a tax return was filed for the applicable year. As a result, in some circumstances, a consumer could be responsible for paying back some of the

---

[1] The American Rescue Plan Act of 2021 temporarily eliminated the income cap for subsidies during the COVID-19 pandemic, making subsidies available for some consumers whose income exceeded 400% of the federal poverty line. These temporary subsidies were extended through 2025 under the Inflation Reduction Act.

subsidy. This repayment obligation could arise if the consumer's income, family size, or other circumstances changed during the year.

## Medicaid

8. The Florida Medicaid program ("Medicaid") provided benefits to certain low-income individuals. Subsidized ACA Plans were not available to individuals who were eligible for Medicaid.

9. The Florida Department of Children and Families ("DCF") Automated Community Connection to Economic Self Sufficiency ("ACCESS") system maintained an online portal called MyACCESS that allowed Floridians to access their public assistance information, including Medicaid information. Consumers could apply for Medicaid through MyACCESS and receive any notices about their application.

## Open Enrollment and Special Enrollment Periods

10. Consumers were permitted to enroll in ACA Plans during the annual open enrollment period. Open enrollment occurred during a set period each year, typically between November 1 of the calendar year preceding the benefit year through January 15 of the benefit year.

11. A consumer was permitted to enroll in an ACA Plan outside of open enrollment if the consumer qualified for a special enrollment period ("SEP") triggered by certain qualifying life events ("QLEs"). SEPs lasted for 60 days following a QLE.

12. QLEs included change in primary place of living, loss of health insurance, change in household size, and change in eligibility for ACA Plan coverage, among others.

13. In some circumstances, applying for and being denied Medicaid was a QLE. Specifically, consumers could apply for an ACA Plan during a SEP if they had applied for Medicaid during open enrollment or due to a QLE, and were determined either after open enrollment or more than 60 days after the QLE to be ineligible for Medicaid.

3

14. During the COVID-19 pandemic, CMS created an additional SEP that allowed consumers in states with Exchanges served by the HealthCare.gov platform to enroll in ACA Plans for benefit year 2021. This SEP was available from February 15, 2021, through August 15, 2021.

15. Beginning on or about March 18, 2022, CMS created an additional SEP applicable to consumers who were eligible for APTCs, who had an estimated annual household income at or below 150% of the federal poverty level in their state, and who were not eligible for Medicaid. This SEP was extended through at least 2025. This SEP did not change the requirements to receive a subsidy.

### ACA Plan Application Process

16. Consumers could apply for ACA Plans online through HealthCare.gov. Consumers could apply directly by entering personal information into the online application, or they could provide their information to an intermediary that applied on their behalf. Individuals or their representatives were required to provide information on their applications demonstrating eligibility for federal subsidies for an ACA Plan.

17. ACA Plan applications on HealthCare.gov included an electronic signature that required consumers to agree to the following attestation: "I'm signing this application under penalty of perjury, which means I've provided true answers to all of the questions to the best of my knowledge. I know I may be subject to penalties under the federal law if I intentionally provide false information."

18. After initially determining that a consumer was eligible for an ACA Plan and determining the amount of any subsidy, the Exchange and CMS often sought to verify and supplement information provided by the consumer. When doing so, the Exchange and CMS provided written notices explaining what information was requested. For example, the Exchange

often sought to verify annual income estimates, incarceration status, citizenship status, and other information.

19. Consumers were allowed at least 90 days from the date of their eligibility notice to provide any additional information requested by the Exchange and CMS. If the consumer missed the deadline, the Exchange made a new determination of the ACA Plan and subsidy amount for which the consumer qualified. This new determination could result in a consumer receiving a lower subsidy or losing the subsidy altogether. If a consumer lost the subsidy or received a lower subsidy, the consumer typically could remain enrolled in the ACA Plan but would be financially responsible for a higher monthly premium payment on that ACA Plan.

### The Defendant, Related Entities, and Relevant Persons

20. From in or around August 1988, through in or around February 2021, Company 1 was an insurance brokerage company. In or around February 2021, Company 2 acquired the assets of Company 1. Company 1 and Company 2 marketed and sold various types of insurance, including ACA Plans, throughout Florida and in other states.

21. Marketing Company 1 was a company formed under the laws of Florida. Marketing Company 1 marketed ACA Plans to consumers in Florida and in other states.

22. Defendant **DAFUD IZA**, a resident of Martin County, Florida, was an Executive Vice President and a compliance officer at Company 1 and Company 2.

23. Accomplice 1, a resident of Martin County, Florida, was a part-owner of Company 1 until its acquisition by Company 2. From in or around September 2016 through in or around November 2022. Accomplice 1 also served as Company 1's Chief Operating Officer and, after Company 2 acquired Company 1, as President.

24. Accomplice 2, a resident of Tarrant County, Texas, was the president and owner of Marketing Company 1.

25. Insurer 1 was a company incorporated under the laws of Florida. Insurer 1 provided health insurance plans throughout Florida, including federally subsidized ACA Plans. Insurer 1 paid commissions to Company 1 and Company 2 for enrolling consumers in ACA Plans issued by Insurer 1.

## Major Fraud Against The United States
### (18 U.S.C. § 1031)

From in or around September 2019, and continuing through in or around September 2022, in Miami-Dade, Broward, Palm Beach, and St. Lucie Counties, in the Southern District of Florida, and elsewhere, the defendant,

**DAFUD IZA,**

did knowingly execute and attempt to execute a scheme and artifice with the intent to defraud the United States and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that such pretenses, representations, and promises were false and fraudulent when made, in a contract, subcontract, subsidy, guarantee, insurance, and other form of Federal assistance, the value of such contract, subsidy, guarantee, insurance, and other form of Federal assistance, and any constituent part thereof, being $1,000,000 or more.

## Purpose of the Scheme and Artifice

26. It was a purpose of the scheme and artifice for the defendant and his accomplices to unlawfully enrich themselves by, among other things: (a) deceptively marketing subsidized ACA Plans to ineligible consumers who were homeless, unemployed, and had no incomes, including paying bribes to induce consumers to agree to enroll in such plans; (b) falsely inflating consumer

income projections on ACA Plan applications in order to make the consumer appear qualified for a subsidized ACA Plan and, in turn, maximize enrollments and commission payments from Insurer 1 to Company 1 and Company 2; (c) submitting and causing the submission, via interstate wire communication, of false and fraudulent applications for subsidized ACA Plans on behalf of consumers who did not qualify for such subsidies; (d) concealing the submission of false and fraudulent applications for subsidized ACA Plans, including by interfering with the Exchange's and CMS's attempts to verify statements about income contained on ACA Plan applications submitted by Company 1 and Company 2; and (e) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the scheme.

### The Scheme and Artifice

The manner and means by which the defendant and his accomplices sought to accomplish the purpose of the scheme and artifice included, among other things, the following:

27. Accomplice 1 caused Company 1 to enter into contracts with Insurer 1 to receive commission payments and other payments in exchange for enrolling consumers in ACA Plans issued by Insurer 1.

28. Accomplice 1 caused Company 1 to hire Accomplice 2 and Marketing Company 1 to solicit ineligible consumers to enroll in subsidized ACA Plans, including by engaging in "street marketing" whereby marketers working for Marketing Company 1 targeted and recruited vulnerable low-income persons and persons experiencing homelessness, unemployment, and mental health and substance abuse disorders, at homeless shelters, bus stops, clinics, and similar locations.

29. **DAFUD IZA**, Accomplice 1, Accomplice 2, and others enrolled, and caused the enrollment of, consumers in subsidized ACA Plans knowing that Marketing Company 1 marketers

working on their behalf had offered bribes in the form of cash, gift cards, food, and alcohol to induce such consumers to agree to enroll; coached consumers on how to falsely respond to application questions to maximize the subsidy amount; and submitted addresses and social security numbers that did not match the consumer purportedly applying.

30. **DAFUD IZA**, Accomplice 1, Accomplice 2, and others used, and caused other Company 1 and Company 2 employees to use, misleading call scripts and other deceptive sales techniques that convinced consumers to agree that they would attempt to make the minimum income necessary to qualify for a subsidized ACA Plan, even when the consumer initially projected zero income.

31. **DAFUD IZA**, Accomplice 1, Accomplice 2, and others enrolled, and caused the enrollment of, consumers in subsidized ACA Plans knowing that the consumers, including those referred by Marketing Company 1, did not qualify for an ACA plan because they did not make, and had no legitimate expectation of making, the minimum income required to receive a subsidy for an ACA Plan.

32. **DAFUD IZA** and Accomplice1 caused Company 1 and Company 2 employees to falsely represent that consumers had experienced a "loss of coverage" or other "life change" in response to the Exchange and CMS's requests for verification of income and other information for successfully-enrolled consumers, in order to extend deadlines for responding to verification requests, make consumers appear eligible for subsidies, and enable Company 1 and Company 2 to continue to receive commissions from Insurer 1.

33. **DAFUD IZA,** Accomplice 1, Accomplice 2, and others submitted, and caused the submission of, Medicaid applications through MyACCESS on behalf of consumers that were designed to cause Medicaid to automatically deny the application, regardless of whether the

consumer in fact qualified for Medicaid. **IZA**, Accomplice 1, Accomplice 2, and others then used these Medicaid denials to trigger an SEP and circumvent the restrictions of open enrollment for ACA Plans.

34. From in or around September 2019, through in or around September 2022, **DAFUD IZA**, Accomplice 1, Accomplice 2, and others submitted, and caused the submission of, false and fraudulent applications for enrollment in ACA Plans, causing CMS and the IRS to pay approximately $133,900,000 in subsidies.

35. As a result of these false and fraudulent enrollments, Insurer 1 paid Company 1 and Company 2 millions of dollars in commission and other payments in exchange for enrolling consumers in ACA Plans issued by Insurer 1.

36. **DAFUD IZA**, Accomplice 1, Accomplice 2, and others used the proceeds of the fraud to benefit Company 1 and Company 2, themselves and others, and to further the fraud scheme.

[This space intentionally blank]

## Act in Execution of the Scheme and Artifice

On or about April 8, 2021, in furtherance of the above-described scheme and artifice, **DAFUD IZA** submitted, and caused the submission of, an ACA Plan application in the name of P.B. seeking a fully-subsidized ACA Plan with Insurer 1 (the "P.B. Application") that falsely and fraudulently represented that P.B.'s projected annual income was $13,100. Based on this projected annual income, CMS approved the P.B. Application and enrolled P.B. in an ACA Plan with Insurer 1 with a subsidy amount of approximately $348.46 per month.

In violation of Title 18, United States Code, Sections 1031 and 2.

*[signature]*
MARKENZY LAPOINTE
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

GLENN S. LEON
CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

*[signature: AUSA for:]*
JAMIE DE BOER
ASSISTANT CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

D. KEITH CLOUSER
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

CASE NO.: 24-80154-CR-ROSENBERG/REINHART
_____

v.

DAFUD IZA,

**CERTIFICATE OF TRIAL ATTORNEY**

_____/
Defendant.

**Superseding Case Information:**
New Defendant(s) (Yes or No) _____
Number of New Defendants _____
Total number of new counts _____

**Court Division** (select one)
☐ Miami   ☐ Key West   ☐ FTP
☐ FTL     ☒ WPB

I do hereby certify that:
1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.
2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, 28 U.S.C. §3161.

3. Interpreter: (Yes or No) __No__
   List language and/or dialect: _____

4. This case will take __0__ days for the parties to try.
5. Please check appropriate category and type of offense listed below:
   (Check only one)                        (Check only one)
   I    ☒ 0 to 5 days                      ☐ Petty
   II   ☐ 6 to 10 days                     ☐ Minor
   III  ☐ 11 to 20 days                    ☐ Misdemeanor
   IV   ☐ 21 to 60 days                    ☒ Felony
   V    ☐ 61 days and over

6. Has this case been previously filed in this District Court? (Yes or No) __No__
   If yes, Judge _____ Case No. _____
7. Has a complaint been filed in this matter? (Yes or No) __No__
   If yes, _____ Magistrate Case No. _____
8. Does this case relate to a previously filed matter in this District Court? (Yes or No) __No__
   If yes, Judge _____ Case No. _____
9. Defendant(s) in federal custody as of _____
10. Defendant(s) in state custody as of _____
11. Rule 20 from the _____ District of _____
12. Is this a potential death penalty case? (Yes or No) __No__
13. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Mills Maynard)? (Yes or No) __No__
14. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared M. Strauss)? (Yes or No) __No__
15. Did this matter involve the participation of or consultation with Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? __No__
16. Did this matter involve the participation of or consultation with Magistrate Judge Marty Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024? __No__

By: _____AUSA_____
D. KEITH CLOUSER
DOJ Trial Attorney
SDFL Court ID No.  A5502882

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name**: _____**DAFUD IZA**_____

**Case No**: _____

Count #:  1

Title 18, United States Code, Section 1031

Major Fraud Against the United States
* Max. Term of Imprisonment:      10 Years
* Mandatory Min. Term of Imprisonment (if applicable):   N/A
* Max. Supervised Release:    3 Years
* Max. Fine:   $5,000,000

\*Refers only to possible term of incarceration, supervised release and fines.  It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America ) | |
| v. ) | Case No. |
| ) | **24-80154-CR-ROSENBERG/REINHART** |
| Dafud Iza, ) | |
| *Defendant* ) | |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

_____
*Printed name of defendant's attorney*

_____
*Judge's signature*

_____
*Judge's printed name and title*