UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. _24-CR-80154-ROSENBERG_____

UNITED STATES OF AMERICA

v.

DAFUD IZA,

        Defendant.
_____/

## PLEA AGREEMENT

The United States of America, by and through the Fraud Section of the Criminal Division of the Department of Justice and the United States Attorney's Office for the Southern District of Florida (hereinafter referred to as the "United States"), and Dafud Iza (hereinafter referred to as the "Defendant"), enter into the following agreement:

1. The Defendant agrees to plead guilty to the Information. The Information charges that the Defendant knowingly executed and attempted to execute a scheme and artifice with the intent to defraud the United States and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, in any insurance and other form of Federal assistance, the value of which was $1,000,000 or more, that is, advanced premium tax credits offered under Affordable Care Act plans in the value of more than $1,000,000, in violation of Title 18, United States Code, Section 1031. The Defendant acknowledges that he has read all the charges against him contained in the Information and that those charges have been fully explained to him by his attorney.

2. The Defendant is aware that the sentence will be imposed by the Court. The Defendant understands and agrees that federal sentencing law requires the Court to impose a

Initials: DI

sentence that is reasonable and that the Court must consider the United States Sentencing Guidelines and Policy Statements (hereinafter referred to as the "Sentencing Guidelines") in determining that reasonable sentence. The Defendant acknowledges and understands that the Court will compute an advisory sentence under the Sentencing Guidelines and that the applicable guidelines will be determined by the Court relying in part on the results of a presentence investigation by the United States Probation Office (hereinafter referred to as the "Probation Office"), which investigation will commence after the guilty plea has been entered. The Defendant is also aware that, under certain circumstances, the Court may depart from the advisory Sentencing Guidelines range that it has computed, and may raise or lower that advisory sentence under the Sentencing Guidelines. The Defendant is further aware and understands that while the Court is required to consider the advisory guideline range determined under the Sentencing Guidelines, it is not bound to impose that sentence. The Defendant understands that the facts that determine the offense level will be found by the Court at the time of sentencing and that in making those determinations the Court may consider any reliable evidence, including hearsay, as well as the provisions or stipulations in this plea agreement. The United States and the Defendant agree to recommend that the Sentencing Guidelines should apply pursuant to *United States v. Booker*, that the Sentencing Guidelines provide a fair and just resolution based on the facts of this case, and that no upward or downward departures are appropriate other than the reductions for acceptance of responsibility. The Court is permitted to tailor the ultimate sentence in light of other statutory concerns, and such sentence may be either more severe or less severe than the Sentencing Guidelines' advisory sentence. Knowing these facts, the Defendant understands and acknowledges that the Court has the authority to impose any sentence within and up to the

Initials: DL

2

statutory maximum authorized by law for the offense identified in paragraph one (1) and that the Defendant may not withdraw the plea solely as a result of the sentence imposed.

3. The Defendant also understands and acknowledges that, as to the allegations set forth in the Information, the Court may impose a statutory maximum term of imprisonment of up to ten (10) years. In addition to any period of imprisonment the Court may also impose a period of supervised release of up to three (3) years to commence at the conclusion of the period of imprisonment. In addition to a term of imprisonment and supervised release, the Court may impose a fine of up to the greater of $5,000,000, pursuant to 18 U.S.C. § 1031(b).

4. The Defendant further understands and acknowledges that, in addition to any sentence imposed under paragraph three (3) of this agreement, a special assessment in the total amount of $100 will be imposed on the Defendant. The Defendant agrees that any special assessment imposed shall be paid at the time of sentencing.

5. The Defendant understands and acknowledges that, as a result of this plea, the Defendant will be excluded from Medicare, Medicaid, Medicare Advantage, and all federal health care programs. The Defendant agrees to complete and execute all necessary documents provided by any department or agency of the federal government, including but not limited to the United States Department of Health and Human Services, to effectuate this exclusion within sixty (60) days of receiving the documents. This exclusion will not affect the Defendant's right to apply for and receive benefits as a beneficiary under any Federal health care program, including Medicare, Medicaid, and Medicare Advantage.

6. The Defendant recognizes that pleading guilty may have consequences with respect to the Defendant's immigration status if the Defendant is not a natural-born citizen of the United

Initials: _DL_

3

States. Under federal law, a broad range of crimes are removable offenses, including the offense to which the Defendant is pleading guilty. In addition, under certain circumstances, denaturalization may also be a consequence of pleading guilty to a crime. Removal, denaturalization, and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict to a certainty the effect of the Defendant's conviction on the Defendant's immigration status. The Defendant nevertheless affirms that the Defendant chooses to plead guilty regardless of any immigration consequences that the Defendant's plea may entail, even if the consequence is the Defendant's denaturalization and automatic removal from the United States.

7. The Defendant shall cooperate with law enforcement officials, attorneys with the United States Department of Justice and United States Attorney's Office for the Southern District of Florida, and with federal regulatory officials charged with regulating or overseeing the Medicare program by providing full, complete and truthful information regarding his knowledge, conduct, and actions while involved in health care and by providing active cooperation in ongoing investigations if requested to do so. If called upon to do so, the Defendant shall provide complete and truthful testimony before any grand jury or trial jury in any criminal case, in any civil proceeding or trial, and in any administrative proceeding or hearing. In carrying out his obligations under this paragraph, the Defendant shall neither minimize his own involvement nor fabricate, minimize, or exaggerate the involvement of others. If the Defendant intentionally provides any incomplete or untruthful statements or testimony, his actions shall be deemed a material breach of this agreement and the United States shall be free to pursue all appropriate

Initials: DL

4

charges against him notwithstanding any agreements to forbear from bringing additional charges as may be otherwise set forth in this agreement.

8. The Defendant shall provide the Probation Office and counsel for the United States with a full, complete, and accurate personal financial statement. If the Defendant provides incomplete or untruthful statements in his personal financial statement, such action shall be deemed a material breach of this agreement and the United States shall be free to pursue all appropriate charges against him notwithstanding any agreements to forbear from bringing additional charges as may be otherwise set forth in this agreement.

9. Provided that the Defendant commits no new criminal offenses and provided that he continues to demonstrate an affirmative recognition and affirmative acceptance of personal responsibility for his criminal conduct, the United States agrees that it will recommend at sentencing that the Defendant receive a three level reduction for acceptance of responsibility pursuant to Section 3E1.1 of the Sentencing Guidelines, based upon the Defendant's recognition and affirmative and timely acceptance of personal responsibility. The United States, however, will not be required to make this sentencing recommendation if the Defendant: (1) fails or refuses to make a full, accurate, and complete disclosure to the United States and the Probation Office of the circumstances surrounding the relevant offense conduct and his present financial condition; (2) is found to have misrepresented facts to the United States prior to entering this plea agreement; or (3) commits any misconduct after entering into this plea agreement, including but not limited to committing a state or federal offense, violating any term of release, or making false statements or misrepresentations to any governmental entity or official.

Initials: _DI_                                5

10. The United States reserves the right to inform the Court and the Probation Office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses committed, whether charged or not, as well as concerning the Defendant and the Defendant's background. Subject only to the express terms of any agreed-upon sentencing recommendations contained in this plea agreement, the United States further reserves the right to make any recommendation as to the quality and quantity of punishment.

11. The United States reserves the right to evaluate the nature and extent of the Defendant's cooperation and to make the Defendant's cooperation, or lack thereof, known to the Court at the time of sentencing. If in the sole and unreviewable judgment of the United States the Defendant's cooperation is of such quality and significance to the investigation or prosecution of other criminal matters as to warrant the Court's downward departure from the sentence advised by the Sentencing Guidelines, the United States may at or before sentencing make a motion pursuant to Title 18, United States Code, Section 3553(e), Section 5K1.1 of the Sentencing Guidelines and/or subsequent to sentencing by motion pursuant to Rule 35 of the Federal Rules of Criminal Procedure, reflecting that the Defendant has provided substantial assistance and recommending a sentence reduction. The Defendant acknowledges and agrees, however, that nothing in this Agreement may be construed to require the United States to file such a motion and that the United States' assessment of the nature, value, truthfulness, completeness, and accuracy of the Defendant's cooperation shall be binding on the Defendant.

12. The Defendant understands and acknowledges that the Court is under no obligation to grant a motion by the United States pursuant to Title 18, United States Code, Section 3553(e), 5K1.1 of the Sentencing Guidelines and/or Rule 35 of the Federal Rules of Criminal Procedure,

Initials: _DL_                                    6

as referred to in paragraph eleven (11) of this agreement, should the United States exercise its discretion to file such a motion.

13. The Defendant admits and acknowledges that the following facts are true and that the United States could prove them at trial beyond a reasonable doubt:

    a. that the Defendant knowingly executed and attempted to execute a scheme and artifice with intent to defraud the United States and obtain money and property by means of false and fraudulent pretenses, representations, and promises, as charged in the Information; and

    b. that the Defendant's participation in the scheme and artifice resulted in actual loss to the Government of more than $65,000,000, but not more than $150,000,000.

14. Based on the foregoing, the United States and the Defendant agree that, although not binding on the Probation Office or the Court, they will jointly recommend that the Court impose a sentence within the advisory sentencing guideline range produced by application of the Sentencing Guidelines. Although not binding on the Probation Office or the Court, the United States and the Defendant further agree that, except as otherwise expressly contemplated in this plea agreement, they will jointly recommend that the Court neither depart upward nor depart downward under the Sentencing Guidelines when determining the advisory sentencing guideline range in this case. The Defendant agrees that he will neither move for a downward departure, nor will he seek a variance from the applicable Guideline sentence pursuant to the factors in Title 18, United States Code, Section 3553(a), except with respect to personal history or personal characteristics unrelated to the charged conduct. Nor will the Defendant suggest that the Probation Department consider a downward departure or adjustment or suggest that the Court *sua sponte*

Initials: _DL_

7

consider a downward departure, except with respect to personal history or personal characteristics unrelated to the charged conduct. The parties agree that, at the time of sentencing, the United States will recommend a sentence at the low end of the Sentencing Guidelines.

15. The United States and the Defendant agree that, although not binding on the Probation Office or the Court, they will jointly recommend that the Court make the following findings and conclusions as to the sentence to be imposed:

   a. Base Offense Level: The Defendant's base offense level is six (6), in accordance with U.S.S.G. § 2B1.1(a)(2).

   b. Loss: The Defendant's offense level shall be increased by twenty four (24) levels pursuant to U.S.S.G. § 2B1.1(b)(1)(M) because the loss to the Government was more than $65,000,000 but less than $150,000,000.

   c. Sophisticated Means: The Defendant's offense level shall be increased by two (2) levels pursuant to U.S.S.G. § 2B1.1(b)(10) because the offense involved sophisticated means and the Defendant intentionally engaged in or caused the conduct constituting sophisticated means.

   TOTAL OFFENSE LEVEL – UNADJUSTED                              32

   d. Zero-Point Offender: The United States and the Defendant agree that, although not binding on the Probation Office or the Court, they will jointly recommend that, pursuant to U.S.S.G. § 4C1.1, the Defendant's offense level should be reduced by two levels to reflect the Defendant's status as a zero-point offender, provided that the Defendant meets all the criteria set out in U.S.S.G. § 4C1.1(a)(1)-(10).

   e. Acceptance of Responsibility: The Defendant's offense level shall be decreased by

three (3) levels pursuant to U.S.S.G. §§ 3E1.1(a) and 3E1.1(b) because the Defendant has clearly demonstrated acceptance of responsibility for his offense and assisted authorities in the investigation and prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty.

TOTAL OFFENSE LEVEL – ADJUSTED <u>27</u>

16. The Defendant acknowledges and understands that additional or different enhancements or provisions of the Sentencing Guidelines might be applicable, and that neither the Court nor the Probation Office is bound by the parties' joint recommendations.

17. The Defendant acknowledges that because the offense of conviction occurred after April 24, 1996, restitution is mandatory without regard to the Defendant's ability to pay and that the Court must order the Defendant to pay restitution for the full loss caused by his criminal conduct pursuant to Title 18, United States Code, Section 3663A. Furthermore, the Defendant stipulates that he owes restitution in the amount of approximately $133,900,000, jointly and severally with his co-conspirators.

18. The Defendant is aware that the sentence has not yet been determined by the Court. The Defendant is also aware that any estimate of the probable sentencing range or sentence that the Defendant may receive, whether that estimate comes from the Defendant's attorney, the United States, or the Probation Office, is a prediction, not a promise, and is not binding on the United States, the Probation Office, or the Court. The Defendant understands further that any recommendation that the United States makes to the Court as to sentencing, whether pursuant to this agreement or otherwise, is not binding on the Court and the Court may disregard the recommendation in its entirety. The Defendant understands and acknowledges, as previously

Initials: _DI_

9

acknowledged in paragraph two (2) above, that the Defendant may not withdraw his plea based upon the Court's decision not to accept a sentencing recommendation made by the Defendant, the United States, or a recommendation made jointly by both the Defendant and the United States.

19. The Defendant is aware that Title 18, United States Code, Section 3742 affords him the right to appeal the sentence imposed in this case. Acknowledging this, in exchange for the undertakings made by the United States in this plea agreement, the Defendant hereby waives all rights conferred by Section 3742 to appeal any sentence imposed, including any forfeiture or restitution ordered, or to appeal the manner in which the sentence was imposed, unless the sentence exceeds the maximum permitted by statute or is the result of an upward departure and/or a variance from the Sentencing Guidelines range that the Court establishes at sentencing. The Defendant further understands that nothing in this agreement shall affect the right of the United States and/or its duty to appeal as set forth in Title 18, United States Code, Section 3742(b). However, if the United States appeals the Defendant's sentence pursuant to Section 3742(b), the Defendant shall be released from the above waiver of appellate rights. By signing this agreement, the Defendant acknowledges that he has discussed the appeal waiver set forth in this agreement with his attorney. The Defendant further agrees, together with the United States, to request that the district Court enter a specific finding that the Defendant's waiver of his right to appeal the sentence to be imposed in this case was knowing and voluntary.

20. For purposes of criminal prosecution, this Plea Agreement shall be binding and enforceable upon the Fraud Section of the Criminal Division of the United States Department of Justice and the United States Attorney's Office for the Southern District of Florida. The United States does not release the Defendant from any claims under Title 26, United States Code. Further,

Initials: *DL*  10

this Agreement in no way limits, binds, or otherwise affects the rights, powers, or duties of any state or local law enforcement agency or any administrative or regulatory authority.

21. The Defendant agrees that if he fails to comply with any of the provisions of this Agreement, including the failure to tender such agreement to the Court, makes false or misleading statements before the Court or to any agents of the United States, commits any further crimes, or attempts to withdraw the plea (prior to or after pleading guilty to the offense identified in paragraph one (1) above), the United States will have the right to characterize such conduct as a breach of this agreement. In the event of such a breach: (a) the United States will be free from its obligations under the agreement and further may take whatever position it believes appropriate as to the sentence and the conditions of the Defendant's release (for example, should the Defendant commit any conduct after the date of this agreement that would form the basis for an increase in the Defendant's offense level or justify an upward departure – examples of which include but are not limited to, obstruction of justice, failure to appear for a court proceeding, criminal conduct while pending sentencing, and false statements to law enforcement agents, the Probation Officer, or the Court – the United States is free under this agreement to seek an increase in the offense level based on that post-agreement conduct); (b) the Defendant will not have the right to withdraw the guilty plea; (c) the Defendant shall be fully subject to criminal prosecution for any other crimes which he has committed or might commit, if any, including perjury and obstruction of justice; and (d) the Defendant waives any protections afforded by Section 1B1.8(a) of the Sentencing Guidelines, Rule 11 of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence, and the United States will be free to use against the Defendant, directly and indirectly, in any criminal or civil proceeding any of the information, statements, and materials provided by him

Initials: DL

11

pursuant to this agreement, including offering into evidence or otherwise using the attached Agreed Factual Basis for Guilty Plea.

22. This is the entire agreement and understanding between the United States and the Defendant. There are no other agreements, promises, representations or understandings.

GLENN S. LEON, CHIEF
U.S. DEPARTMENT OF JUSTICE
CRIMINAL DIVISION, FRAUD SECTION

MARKENZY LAPOINTE
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

Date: 11/14/2024     By: _____
JAMIE DE BOER
ASSISTANT CHIEF
CRIMINAL DIVISION, FRAUD SECTION

D. KEITH CLOUSER
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION

Date: 11/13/24     By: _____
DAFUD IZA
DEFENDANT

Date: 11/13/2024     By: _____
DAVID JOFFE
COUNSEL FOR DEFENDANT

Initials: DI

12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-CR-80154-ROSENBERG

UNITED STATES OF AMERICA

v.

DAFUD IZA,

Defendant.
_____/

## AGREED FACTUAL BASIS FOR GUILTY PLEA

Defendant Dafud Iza (hereinafter referred to as the "Defendant" or "Iza") hereby acknowledges and agrees that, if this case were to go to trial, the United States would establish and prove the following facts beyond a reasonable doubt:

Beginning in or around September 2019, and continuing through in or around September 2022, in Miami-Dade, Broward, Palm Beach, and St. Lucie Counties, in the Southern District of Florida, and elsewhere, the Defendant did knowingly execute and attempt to execute a scheme and artifice with the intent to defraud the United States and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, in any subsidy, insurance, and other form of Federal assistance, the value of which was $1,000,000 or more, that is, advanced premium tax credits ("APTCs" or "subsidies") offered under Affordable Care Act ("ACA") plans in the value of more than $1,000,000, in violation of Title 18, United States Code, Section 1031.

The ACA established a premium tax credit, which was a refundable tax credit designed to assist eligible individuals and families in affording health insurance purchased through an "Exchange." The amount of the premium tax credit available to a consumer was based on a sliding scale; consumers with lower incomes received a larger credit, while consumers with

Initials: DI

1

higher incomes received a smaller credit. To be eligible for a premium tax credit in Florida, a consumer's household income generally had to be greater than 100% and less than 400% of the federal poverty level. Individuals with incomes below the federal poverty level did not qualify for a premium tax credit. Consumers who were eligible for a premium tax credit could elect to receive their tax credits in advance, or they could claim their tax credit as a lump sum when they filed taxes. Consumers frequently elected to receive their premium tax credit in advance, in the form of a subsidy paid directly to the insurer sponsoring their plan.

Individuals were permitted to enroll in ACA plans during the annual open enrollment period. Open enrollment occurred during a set period each year, typically between November 1 of the calendar year preceding the benefit year through January 15 of the benefit year. A person could enroll outside of open enrollment only if they qualified for a "special enrollment period" (or "SEP") triggered by certain qualifying life events ("QLEs"). SEPss lasted for 60 days following a qualifying life event. QLEs included: change in primary place of living; loss of health insurance; change in household size; change in eligibility for ACA plan coverage; and other qualifying situations.

From in or around August 1988, through in or around February 2021, Company 1 was an insurance brokerage company formed under the laws of Florida, with its principal place of business in Stuart, Florida. Company 1 sold various types of insurance throughout Florida, including, after the ACA went into effect, ACA plans. On or about February 26, 2021, the assets of Company 1 were acquired by another insurance brokerage firm, Company 2, a company formed under the laws of Florida with a principal place of business in Orange County, Florida. Company 2 continued to do business under the name of Company 1.

Initials: _OL_

2

Individual 1 served as Company 1's Chief Operating Officer and a part-owner of Company 1 until Company 1 was acquired by Company 2. After Company 1 was acquired by Company 2, Individual 1 served as Company 2's President.

Individual 2 was the owner of a marketing company, Marketing Company 1.

Iza served as one of Company 1's Executive Vice Presidents and remained an Executive Vice President after Company 2 acquired Company 1 and throughout the relevant time period charged in the Information.

Marketing Company 1 was a company formed under the laws of Florida and owned and managed by Individual 2. Company 1 engaged Marketing Company 1 to conduct "street marketing" directly to consumers for ACA plans.

Insurer 1 was an insurance company incorporated under the laws of Florida. Insurer 1 provided health insurance throughout Florida, including federally subsidized ACA plans. Insurer 1 paid commissions to Company 1 and Company 2 for enrolling consumers in plans issued by Insurer 1.

From in or around September 2019, and continuing through in or around September 2022, Iza, Individual 1, Individual 2, and others falsified and caused the falsification of thousands of ACA plan applications by misrepresenting consumers' incomes to make them appear eligible for subsidies, when in fact they were not. Iza, Individual 1, Individual 2, and others also manipulated SEPs to enroll consumers in subsidized ACA plans year-round, in order to maximize the total volume of enrollments, including fraudulent enrollments.

Individual 1, on behalf of Company 1 and Company 2, engaged Individual 2, Marketing Company 1, and others to conduct "street marketing" campaigns for ACA plans. The street

Initials: _DI_                                3

marketers were paid a commission by Company 1 and Company 2 in exchange for referring consumers for enrollment in ACA plans. The street marketers recruited consumers at homeless shelters, bus stops, clinics, and other areas where low-income individuals were likely to be found. Iza knew that street marketers offered bribes to consumers in exchange for agreeing to enroll in ACA plans. Iza also knew that street marketers coached consumers on how to respond to application questions, including how to provide false responses to questions about income, and Iza knew that street marketers often provided invalid identifiers for the individuals they referred for enrollment (i.e., referred consumers with social security numbers or other identifiers that did not match the consumer's reported name).

Individual 1 and others directed Company 1 and Company 2 employees to enroll consumers referred by Marketing Company 1 in fully subsidized plans. By enrolling consumers in fully subsidized plans, Individual 1 and other Company 1 and Company 2 employees ensured that the consumers had no financial responsibility to maintain the plan, since the subsidy payments fully covered the premiums. However, the vast majority of consumers referred by Marketing Company 1 to Company 1 and Company 2 had little to no qualifying income and were ineligible for subsidies. To ensure that these consumers could nonetheless be enrolled in subsidized plans, Company 1 and Company 2 employees, with Individual 1's, Iza's, and others' approval, used call scripts designed to lead a consumer to agree that Company 1 and Company 2 could enter their income at the minimum amount required for a federal subsidy. Individual 1, Iza, and other supervisors at Company 1 and Company 2 authorized Company 1 and Company 2 employees to "bump up," i.e. falsely and fraudulently increase, income to the minimum required for a federal subsidy. For example, Individual 1, Iza, and other supervisors at Company 1 and Company 2

Initials: DI

4

directed Company 1 and Company 2 call center employees to ask a consumer to agree that the consumer would attempt to make a certain income (often $13,000 a year, or another income near the federal poverty level for the applicable year), or to input a certain income on the application, even where the consumer initially reported that his or her income was zero. This was often done without inquiry into the consumer's potential sources of income and without any good-faith basis to believe the consumer was going to make the minimum income. Individual 1, Iza, and other supervisors at Company 1 and Company 2 thus routinely caused reported incomes to be falsified to ensure the consumer would be enrolled in a fully subsidized ACA plan.

Once a consumer was enrolled in an ACA plan, the Exchange often asked consumers to verify specific information, including income. If a consumer did not verify their income within a certain period of time, typically 90 days, the consumer was at risk of losing their subsidy. At Individual 1's, Iza's, and other Company 1 and Company 2 supervisors' direction, Company 1 and Company 2 employees performed "subsidy reviews" or "subsidy fixes" whereby the employees accessed consumers' ACA plan information online and indicated that the consumer experienced a "life change." For consumers referred by Marketing Company 1, Company 1 and Company 2 employees typically did not contact the consumer before performing a "subsidy fix," did not attempt to verify the consumer's income, and had no basis for representing that the consumer had experienced a life change. This process ensured that the consumer did not lose the subsidy at the end of the 90-day verification window.

Finally, during much of the relevant time period, at Individual 1's, Iza's, and other Company 1 and Company 2 supervisors' direction, Company 1 and Company 2 employees routinely secured false and fraudulent "Medicaid denials" on behalf of consumers and used those

Initials: DI

5

denials to enroll consumers in ACA plans outside of open enrollment, all to circumvent the limitations of open enrollment. In truth and fact, the consumers typically did not experience a job change, loss of coverage, move, marriage, or similar qualifying life event. Instead, at Individual 1's, Iza's, and other Company 1 and Company 2 supervisors' direction, Company 1 and Company 2 employees submitted Medicaid applications for large volumes of consumers, including consumers referred by Marketing Company 1, in a manner designed to secure a denial. At Individual 1's, Iza's, and other Company 1 and Company 2 supervisors' direction, Company 1 and Company 2 employees then used these denials to represent to the Exchange that the consumers qualified for an SEP. Through this process, Company 1 and Company 2 employees could enroll consumers in ACA plans at any time during the year, entirely circumventing open enrollment and special enrollment limitations. At Individual 1's, Iza's, and other Company 1 and Company 2 supervisors' direction, Company 1 and Company 2 employees used this process to submit numerous applications for ACA plans containing false and fraudulent income amounts on behalf of consumers referred by Marketing Company 1.

In total, Individual 1, Iza, and other Company 1 and Company 2 supervisors caused Company 1 and Company 2 to submit applications for thousands of consumers referred by Marketing Company 1. The government paid subsidies on these plans in at least the approximate amount of $133,900,000.

As part of the scheme, on or about April 8, 2021, IZA, Individual 1, and Individual 2, along with others, submitted or caused to be submitted an application to enroll in an ACA plan that contained a false and fraudulent income amount on behalf of consumer P.B.

Initials: DI

6

The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the charges against me. It does not include all of the facts known to me concerning criminal activity in which I and others engaged. I make this statement knowingly and voluntarily and because I am in fact guilty of the crimes charged.

GLENN S. LEON, CHIEF
U.S. DEPARTMENT OF JUSTICE
CRIMINAL DIVISION, FRAUD SECTION

MARKENZY LAPOINTE
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

Date: 11/14/2024        By: _____
                        JAMIE DE BOER
                        ASSISTANT CHIEF
                        CRIMINAL DIVISION, FRAUD SECTION

                        D. KEITH CLOUSER
                        TRIAL ATTORNEY
                        CRIMINAL DIVISION, FRAUD SECTION

Date: 11/13/24          By: _____
                        DAFUD IZA
                        DEFENDANT

Date: 11/13/2024        By: _____
                        DAVID JOFFE
                        COUNSEL FOR DEFENDANT

Initials: DI

7